## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

                                  **Crim. No. 16-CR-20432**

**v.**

                                  **Hon. Sean F. Cox**

**DAWN K. BENTLEY,**

        **Defendant.**

_____/

## TRIAL BRIEF OF THE UNITED STATES

# <u>TABLE OF CONTENTS</u>

I.  TABLE OF AUTHORITIES ............................................................................... iii

II.  BACKGROUND AND EXPECTED EVIDENCE ................................................... 1-5

III.  THE CHARGES IN THE SUPERSEDING INDICTMENT ............................... 5-10

    a.  Conspiracy to Commit Health Care Fraud, Wire Fraud, and Mail Fraud............ 6-7

    b.  Wire Fraud and Mail Fraud............................................................................ 7-10

IV.  EXPECTED TRIAL ISSUES ............................................................................. 10-53

    a.  The Government Intends to Offer Evidence of Defendant Bentley's Statements
        Made to Law Enforcement ............................................................................ 10-19

    b.  The Government Intends to Admit Statements of the Defendants' Co-
        Conspirators .................................................................................................. 20-24

    c.  The Government Intends to Offer Consensual Recordings Involving Defendant
        Bentley Made by a Confidential Human Source ........................................... 24-32

    d.  Defendant Should Be Precluded from Blaming Medicare or Medicaid .......... 33-35

    e.  The Court Should Preclude the Use of Law Enforcement Agent Interview Reports
        or Rough Notes for Impeachment of Government Witnesses ........................ 35-39

    f.  The Government May Offer Evidence of Defendant's Conduct That Is Similar
        and Related to the Conduct in the Superseding Indictment........................... 39-46

    g.  Defendant Should Be Precluded From Offering Evidence of Any Legitimate
        Medical Billing or Other Good Conduct as a Defense to the Charges in the
        Superseding Indictment ................................................................................ 46-47

    h.  Defendant Should Not Be Permitted to Make Any Argument that Encourages
        Jurors to Ignore the Law or This Court's Instructions, or Otherwise Violates
        Their Oaths as Jurors .................................................................................... 48-50

    i.  Other Evidentiary Issues .............................................................................. 50-53

V.  CERTIFICATE OF SERVICE ................................................................................ 54

# TABLE OF AUTHORITIES

**CASES:**                                                                    **Page**

*Carpenter v. United States*, 484 U.S. 19 (1987) ......................................................9

*Goldberg v. United States*, 425 U.S. 94(1976) ......................................................36

*Palermo v. United States*, 360 U.S. 343, 352 (1959) ...................................36,37,38

*United States v. Adams*, 722 F.3d 788 (6th Cir. 2013) ......................................19,25

*United States v. Allen*, 201 F.3d 163 (2d Cir. 2000)..............................................34

*United States v. Alsop*, 12 F. App'x 253 (6th Cir. 2001)....................................30,31

*United States v. Arce*, 997 F.2d 1123 (5th Cir. 1993) ............................................21

*United States v. Artis*, 261 Fed. App'x 176 (11th Cir. 2008) ..................................14

*United States v. Ayotte*, 741 F.2d 865 (6th Cir. 1984)............................................21

*United States v. Benchick*, No. 13-CR-20453, 2014 WL 4181970 (E.D. Mich. Aug. 21, 2014) ........................................................................................................33

*United States v. Blakemore*, 489 F.2d 193 (6th Cir. 1973) ....................................50

*United States v. Blankenship*, 775 F.2d 735 (6th Cir. 1985) ..................................44

*United States v. Brien*, 617 F.2d 299 (1st Cir. 1980)..............................................33

*United States v. Brika*, 416 F.3d 514 (6th Cir. 2005) ............................................38

*United States v. Calhoun*, 49 F.3d 231 (6th Cir. 1995)  ....................................48,52

*United States v. Clark*, 18 F.3d 1337 (6th Cir. 1994)............................................20

*United States v. Clay*, 667 F.3d 689 (6th Cir. 2012) ..............................................45

*United States v. Colton*, 231 F.3d 890 (4th Cir. 2000) ..........................................33

*United States v. Copeland*, 291 F. App'x 94 (9th Cir. 2008)  ................................49

*United States v. Cortez*, No. CRIM. 14-20209, 2014 WL 6946798 (E.D. Mich. Dec. 8, 2014) ....................................................................................................19

*United States v. Daniel*, 329 F.3d 480 (6th Cir. 2003) ............................................9

*United States v. Davis*, 226 F.3d 346 (5th Cir. 2000)............................................34

*United States v. Deitz*, 577 F.3d 672 (6th 2009)................................................31,32

*United States v. DeJohn*, 368 F.3d 533 (6th Cir. 2004)..........................................26

*United States v. Dimora*, 750 F.3d 619 (6th Cir. 2014)..........................................47

*United States v. Dortch*, 5 F.3d 1056 (7th Cir. 1993)............................................14

*United States v. Doyon*, 194 F.3d 207 (1st Cir.1999)............................................26

*United States v. Duval*, 865 F. Supp. 2d 803 (E.D. Mich. 2012) ..........................49

*United States v. Edmond*, 815 F.3d 1032 (6th Cir. 2016)...................................40,41

*United States v. Elder*, 90 F.3d 1110 (6th Cir. 1996)............................................29

*United States v. Ellisor*, 522 F.3d 1255 (11th Cir. 2008) ......................................47

*United States v. Fifer*, 206 Fed. App'x 502 (6th Cir. 2006)  ..................................14

*United States v. Ford*, 761 F.3d 641 (6th Cir. 2014)..........................................18,19

iii

*United States v. Frederick*, 406 F.3d 754 (6th Cir. 2005) ........................................40
*United States v. Funches*, 135 F.3d 1405 (11th Cir. 1998) ....................................48
*United States v. Green*, 600 F.2d 154 (8th Cir. 1979)............................................21
*United States v. Griffith*, 17 F.3d 865 (6th Cir. 1994)............................................10
*United States v. Hardwick*, 544 F.3d 565 (3d Cir. 2008) ......................................16
*United States v. Hardy*, 228 F.3d 745 (6th Cir. 2000)............................................40
*United States v. Henderson*, 626 F.3d 326 (6th Cir. 2010) ...................................31
*United States v. Hill*, 526 F.2d 1019 (10th Cir. 1975)............................................38
*United States v. Hogan*, 402 F. App'x 54 (6th Cir. 2010)......................................27
*United States v. Hunt*, 521 F.3d 636 (6th Cir. 2008) ...............................................7
*United States v. Jacob*, 377 F.3d 573 (6th Cir. 2004) ............................................29
*United States v. James*, 496 F. App'x 541 (6th Cir. 2012)......................................33
*United States v. Johnson*, 581 F.3d 320 (6th Cir. 2009)....................................31,32
*United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998) .....................................15,16
*United States v. Krzyske*, 836 F.2d 1013 (6th Cir. 1988) .......................................48
*United States v. Lanzar*, 69 F. App'x 224 (6th Cir. 2003) .....................................27
*United States v. Larch*, 399 F. App'x 50( 6th Cir. 2010) .......................................52
*United States v. Leonardi*, 623 F.2d 746 (2d Cir. 1980) ........................................38
*United States v. Levin*, No. 15 CR. 101 (KBF), 2016 WL 299031 (S.D.N.Y. Jan. 25, 2016) ...........................................................................................49
*United States v. Marks*, 816 F.2d 1207 (7th Cir. 1987)..........................................39
*United States v. McDaniel*, 398 F.3d 540 (6th Cir. 2005) ......................................19
*United States v. McLernon*, 746 F.2d 1098 (6th Cir. 1984) ...............................23,24
*United States v. Meda*, No. 11-20052, 2013 WL 398924 (E.D. Mich. Feb. 1, 2013)40
*United States v. Mooneyham*, 473 F.3d 280 (6th Cir. 2007) .........................23,30,32
*United States v. Olive,* 804 F.3d 747 (6th Cir. 2015) ...............................................9
*United States v. Panaro,* 266 F.3d 939 (9th Cir.2001)............................................26
*United States v. Parenteau*, 529 F. App'x 532 (6th Cir. 2013) .........................26,27
*United States v. Pike*, 342 F. App'x 190 (6th Cir. 2009)........................................30
*United States v. Raisley*, 466 F. App'x 125 (3d Cir. 2012) ....................................14
*United States v. Rivera*, 153 F.3d 809 (7th Cir.1998) ............................................26
*United States v. Robinson*, 763 F.2d 778 (6th Cir. 1985)........................................25
*United States v. Salgado*, 250 F.3d 438 (6th Cir. 2001)...............................20,22,23
*United States v. Scarborough*, 43 F.3d 1021 (6th Cir. 1994) .............................27,29
*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) .............................................47
*United States v. Segines*, 17 F.3d 847 (6th Cir. 1994)............................................28
*United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993) .....................................48
*United States v. Shannon*, 803 F.3d 778 (6th Cir. 2015)....................................13,15

iv

*United States v. Silber*, No. 09-20223, 2010 WL 1222723 (E.D. Mich. Mar. 25, 2010) ..................................................................................................14

*United States v. Simms*, 351 F. App'x 64 (6th Cir. 2009) ........................................26

*United States v. Stone*, No. 10–20123, 2011 WL 17613 (E.D. Mich. Jan. 4, 2011)21

*United States v. Sutton,* 387 F. App'x 595 (6th Cir. 2010)...................................32

*United States v. Svete*, 556 F.3d 1157 (11th Cir. 2009)............................................33

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) .............................................48

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004) ............................................34

*United States v. Thompson*, No. 99-41007, 2001 WL 498430 (5th Cir. Apr. 9, 2001) ..................................................................................................48

*United States v. Warman*, 578 F.3d 320 (6th Cir. 2009) ........................................22

*United States v. Watson*, 525 F.3d 583 (7th Cir. 2008) ...........................................32

*United States v. Wesley*, 417 F.3d 612 (6th Cir. 2005).....................................25,26

*United States v. West*, 948 F.2d 1042 (6th Cir. 1991) ............................................28

*United States v. Wilkinson*, 53 F.3d 757 (6th Cir. 1995) .......................................25

*United States v. Winograd*, 656 F.2d 279 (7th Cir. 1981) ....................................47

*United States v. Young*, 470 U.S. 1 (1985) ............................................................52

## STATUTES:

18 U.S.C. § 1349 ..................................................................................................... 6-7

18 U.S.C. § 1343 .........................................................................................................7

18 U.S.C. § 1341 .........................................................................................................7

The United States, through the undersigned counsel, respectfully submits this brief for the trial of *United States v. Dawn K. Bentley*, which is scheduled to commence on Tuesday, January 10, 2017.  The government seeks to bring to the Court's attention (and set forth the government's position on) certain issues that may arise during trial, with the intention of limiting disruption while the jury is present, enhancing the presentation of evidence to the jury, and shortening the time necessary to complete the trial.  Additionally, the government sets forth motions in limine as detailed below.[1]

## Background and Expected Evidence

Defendant Dawn Bentley is charged with one count of conspiracy to commit health care fraud, wire fraud, and mail fraud in violation of 18 U.S.C. § 1349, two counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of mail fraud in violation of 18 U.S.C. § 1341.  These charges stem from Defendant's participation in a scheme to defraud by submitting false and fraudulent claims to Medicare and Medicaid for services purportedly provided by Dr. Waseem Alam, M.D., who pled guilty to an expansive health care fraud conspiracy under a separate indictment.

---

[1] The government conferred with defense counsel in conformance with Local Rule 7.1 and sets forth its position on the issues herein in the event they arise at trial.

1

Defendant Bentley owned Physician's Medical Billing Service, LLC ("PMBS"), which provided credentialing and billing services for physicians. Through PMBS, Defendant contracted to perform credentialing and medical billing for Dr. Alam, including his practices Waseem Alam, M.D., P.C. ("M.D. P.C."), and Woodward Urgent Care PLLC. To obtain provider credentials for Dr. Alam and his practices, Defendant submitted enrollment applications so that Dr. Alam could bill Medicare and Medicaid. In addition, as Dr. Alam's biller, Defendant Bentley submitted claims to Medicare and Medicaid for services purportedly provided by Dr. Alam in his practices and in hospital settings.

Beginning in or around June 2014, Defendant Bentley, with Dr. Alam, devised a scheme to submit false and fraudulent claims to Medicare and Medicaid for services that were medically unnecessary, not provided as billed, or not eligible for reimbursement. As part of this scheme, Defendant Bentley, among other things, submitted false and fraudulent claims for services that were not (and could not have been provided) and encouraged Dr. Alam to engage in "upcoding"—that is, using an inaccurate medical billing code to increase the reimbursement paid to the provider.

Certain billing codes for physician services denote the level of complexity of the service and generally suggest that the physician spent a certain amount of face-

2

to-face time with the patient. CPT code 99213 generally indicates that the physician spent 15 minutes face to face with a patient, while code 99214 generally indicates that the physician spent 25 minutes face to face with the patient. The evidence will show that Defendant Bentley encouraged Dr. Alam to upcode his billing for office visits to increase his Medicare and Medicaid reimbursements, and that she submitted false and fraudulent claims for services that were not provided as billed.

Recordings made by a former employee of Dr. Alam's office, as a confidential human source ("CHS") for law enforcement, between May 2014 and May 2015 reveal Defendant Bentley's role in the fraudulent scheme. These recordings show, *inter alia*:

- Defendant Bentley was well aware of the face-to-face components associated with the 99213 and 99214 codes. Yet Defendant Bentley advised Dr. Alam to use the 99214 code when billing Medicaid, which had a lower reimbursement rate, even though he did not satisfy the requirements for this code. Defendant Bentley counseled that Dr. Alam should use the 99214 code for Medicaid claims and that their fraud would not be detected because, according to the Defendant, Medicaid did not track this.

3

- While Defendant Bentley was encouraging Dr. Alam to submit claims for more complex visits, she recognized that Dr. Alam could not have performed all of the services he was purporting to have provided as billed. She noted that Dr. Alam would have had to work 25 hours in a day in order for his billing records to be accurate.  In fact, the evidence will show that Dr. Alam often double- or triple-booked patients in his office, so he did not and could not have provided the services as they were billed to Medicare and Medicaid.

- Defendant Bentley was aware that Dr. Alam routinely waived co-pays from patients, a form of an improper kickback, which Defendant Bentley recognized was illegal.

- Defendant Bentley submitted claims for office visits purportedly performed on Dr. Alam's office employees that she was told had not actually occurred.

Medicare and Medicaid claims data corroborate these recordings.  The data confirm that after Defendant Bentley advised Dr. Alam to bill under 99214, Dr. Alam's use of this code dramatically increased.  The claims data also confirm that Defendant Bentley repeatedly billed more than 24 hours of services supposedly provided by Dr. Alam in a single day.  Yet even though Defendant Bentley recognized during the recorded conversations that Dr. Alam was purporting to

4

provide an impossible quantity of services, she continued to bill Medicare and Medicare for these services.

As compensation, Defendant Bentley received six percent of Dr. Alam's reimbursements from Medicare and Medicaid. Thus, when Defendant submitted claims for services that Dr. Alam did not perform—and could not have performed—as billed, both Dr. Alam and Defendant Bentley shared in the financial reward.

In addition to presenting the CHS recorded conversations, the government anticipates calling as witnesses Dr. Alam, the CHS, other co-conspirators. These witnesses will describe how Defendant Bentley advised Dr. Alam to upcode in order to increase his reimbursements, and how Defendant Bentley continued to submit claims for Dr. Alam even after recognizing that he could not have been performing all of the services he was purporting to provide. The government anticipates calling representatives from Medicare and Medicaid and federal agents, and the government will present Medicare and Medicaid enrollment documents, claims data, and banking information to establish, among other things, that Defendant Bentley played a critical role in this scheme.

## The Charges in the Superseding Indictment

As noted above, Defendant Bentley is charged in the Superseding Indictment

5

with one count of conspiracy to commit health care fraud, wire fraud, and mail fraud in violation of 18 U.S.C. § 1349, two counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of mail fraud in violation of 18 U.S.C. § 1341.

## A. 18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud, Wire Fraud, and Mail Fraud

Count one charges a conspiracy to commit health care fraud, wire fraud, and mail fraud under 18 U.S.C. § 1349. The elements of count one are: (1) that two or more persons conspired, or agreed, to commit the crime of health care fraud, wire fraud, or mail fraud; and (2) that the defendant knowingly and voluntarily joined the conspiracy. 18 U.S.C. § 1349; Sixth Circuit Pattern Jury Instruction 3.01A Commentary Note (listing 18 U.S.C. § 1349 as among the conspiracies which do not require proof of an overt act).[2] Section 1349 does not require proof of an overt

_____

[2] Defendant is not charged with any substantive counts of health care fraud, which is prohibited by 18 U.S.C. § 1347. For purposes of the health care fraud object of the conspiracy charged in count one, section 1347 requires the government to prove: (1) that the defendant knowingly and willfully executed or attempted to execute a scheme to defraud any health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises any of the money or property owned by or in the control of a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) that the scheme related to a material fact or included a material misrepresentation or concealment of a material fact; and (3) that the defendant had the intent to defraud. _See_ Sixth Circuit Pattern Jury Instruction 10.05. The government does not have to have to prove: (1) that the defendant had actual knowledge of the statute or specific intent to commit a violation of the statute; (2) that the health care benefit program suffered any financial loss; (3) that

6

act to advance or help the charged conspiracy.  *See* 18 U.S.C. § 1349; Sixth Circuit Pattern Jury Instruction 3.01A Commentary Note (listing 18 U.S.C. § 1349 as among the conspiracies which do not require proof of an overt act).

To prove the defendant is guilty of entering a criminal conspiracy, in this instance to commit health care fraud, wire fraud, or mail fraud, "[t]he Government need not show a formal written agreement.  Instead, it is sufficient to demonstrate a tacit or mutual understanding among the parties. Likewise, direct evidence of the conspiracy is not necessary. It is enough to present circumstantial evidence which a reasonable person could interpret as showing participation in a common plan . . . ." *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (internal citations, alterations, and quotations omitted).

## B.      18 U.S.C. §§ 1343, 1341:  Wire Fraud & Mail Fraud

Counts two and three charge substantive instances of wire fraud, which is prohibited by 18 U.S.C. § 1343, and count four charges a substantive instance of mail fraud, which is prohibited by 18 U.S.C. § 1341.

Section 1343 makes it a federal offense for a defendant, having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to

the defendant engaged in interstate commerce; (4) or that the acts of the defendant affected interstate commerce.  *Id.*

7

transmit or cause to be transmitted by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing the scheme or artifice.  Section 1341 prohibits, for the purpose of executing such a scheme or artifice, placing in any post office or authorized depository for mail anything to be sent or delivered by the Postal Service, depositing anything to be sent or delivered by a private or commercial interstate carrier, or knowingly causing anything to be delivered by mail or a private or commercial interstate carrier to the person to which it is addressed or at the place to which it is directed.

The two wire fraud counts are based on specific interstate wire communications submitting claims for services (office visits purportedly provided by Dr. Alam to the identified Medicare beneficiaries) that Defendant Bentley transmitted or caused to be transmitted on the identified dates.  Each wire communication was in furtherance of the broader fraudulent scheme to defraud Medicare and Medicaid:  these claims were submitted for services purportedly provided on a day in which Defendant Bentley, on behalf of Dr. Alam, billed for services exceeding 24 hours in a single day.  The mail fraud count is based on the use of the mail to send a Medicare revalidation application on form CMS-855I for Dr. Alam on or about the identified date, which furthered the scheme to defraud by

8

permitting Defendant Bentley to continue to submit claims for reimbursement to Medicare for services purportedly provided by Dr. Alam.

To convict the defendant of wire fraud in counts two and three, the government must prove that (1) the defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property; (2) the scheme included a material misrepresentation or concealment of a material fact; (3) the defendant had the intent to defraud; and (4) the defendant used or caused another to use wire, radio, or television communications in interstate commerce in furtherance of the scheme. *See* Sixth Circuit Pattern Jury Instruction 10.02. The elements of mail fraud for purposes of count four are the same as those for wire fraud, except that the fourth element requires proof "that the defendant used the mail or caused another to use the mail in furtherance of the scheme." *See* Sixth Circuit Pattern Jury Instruction 10.01; *United States v. Olive*, 804 F.3d 747, 753 (6th Cir. 2015) ("Mail fraud has essentially the same elements except that the use of the mails rather than a wire is required.").[3]

---

[3] Because sections 1341 and 1343 share common language and elements, courts apply the same analysis and rely on cases construing both statutes in analyzing mail and wire fraud offenses. *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here."); *United States v. Daniel*, 329 F.3d 480 n.1, 486 (6th Cir. 2003) ("We note that cases construing mail fraud can be used in analyzing wire fraud.").

9

Importantly, for wire or mail fraud, the government does not have to prove (1) all of the details alleged concerning the precise nature and purpose of the scheme; (2) that the material transmitted by wire or mail was itself false or fraudulent; (3) that the alleged scheme succeeded in defrauding anyone; (4) that the use of the wire or mail was intended as the specific or exclusive means of accomplishing the fraud; (5) that someone relied on the misrepresentation or false statement; or (6) that the defendant obtained money or property for their own benefit.  *See* Sixth Circuit Pattern Jury Instruction 10.01, 10.03.  Furthermore, "the defendant [her]self does not have to use the mails or [wires], provided it is foreseeable that the mails or wire services could be used to further [the] scheme." *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994).

## Expected Trial Issues

**A.**    **The Government Intends to Offer Evidence of Defendant Bentley's Statements Made to Law Enforcement**

> 1.    *Defendant Bentley's voluntary statements made to law enforcement on July 7, 2015 are admissible when offered by the government.*

On July 7, 2015, Defendant Bentley was interviewed at her residence by agents of the Federal Bureau of Investigation ("FBI"), and made several voluntary statements.  (*See* FBI Report of Interview dated July 7, 2015 [appended as Exhibit A].)  She told law enforcement, among other things, that she began working for Dr.

10

Alam in 2002; she handled his credentialing and enrollments to bill Medicare Part

B, Medicaid, and various private insurance programs; and she and her company,

Physicians Medical Billing Service, processed the claims for Dr. Alam's practice,

M.D. P.C., his urgent care clinic, Woodward Urgent Care, and his hospital patients

at St. Joseph's and Providence Hospitals.  Defendant Bentley informed them that

she received 6% of Dr. Alam's insurance reimbursements as compensation for her

services.

    In this interview, Defendant Bentley acknowledged that Dr. Alam went

through periods during which she felt that the claims she was submitting on his

behalf were "more than what would be allowed."  She described an example day in

which Dr. Alam would see upwards of 60 patients and bill for face-to-face visits

with varying complexities and times ranging from 10 to 25 minutes.  She further

told law enforcement that, while she could not confirm whether or not Dr. Alam

was actually seeing the patients, she believed there would be no way that he could

actually be spending the time that he was claiming.

    According to Defendant Bentley, on one specific occasion, she confronted

Dr. Alam in his office and laid out his claims for a day's worth of billing to show

him that, based on the quantity of patients and the codes he was using, he had

billed for 24 hours' worth of visits.  She illustrated how this amount was

11

impossible if time for driving, sleep, and meals were taken into account.  When Dr.

Alam told her that it was his practice and he could do what he wanted, Defendant

Bentley countered that she was culpable in any fraud that may be taking place.

Defendant Bentley claimed that, after these conversations, Dr. Alam would

decrease his claims for a few weeks before reverting to bill at concerning rates.

Defendant Bentley also told law enforcement that Dr. Alam frequently asked

her to write off co-pays.  She informed Dr. Alam that this was illegal and could get

both of them in trouble, but nevertheless did so.

Defendant Bentley's statements were made voluntarily not during the course

of a custodial interrogation.  These voluntary statements to law enforcement are

admissible non-hearsay as the statements of an opposing party, *see* Fed. R. Evid.

801(d)(2), and the government may introduce the statements in its case in chief.

> 2.   *The government intends to offer evidence of Defendant Bentley's statements made to law enforcement on August 11, 2015 if she testifies or offers evidence inconsistent with those statements.*

Defendant Bentley made additional statements to law enforcement, while

represented by counsel, on August 11, 2015 under a limited use agreement, often

referred to as a *Kastigar* or proffer letter.  (*See* FBI Report of Interview dated

August 11, 2015 [appended as Exhibit B].)  The proffer letter, dated the same date,

is attached as Exhibit C.  The government intends to use the August 11, 2015

12

statements if Defendant Bentley triggers the terms of the agreement by

(1) testifying, (2) offering any evidence inconsistent with the statements through

direct examination, or (3) offering any evidence inconsistent with the statements

through cross examination.

The proffer letter, which, at the time, was the standard agreement used in

this district, provides, in relevant part:

> If your client is prosecuted, the government may use your client's
> statements in cross-examining your client, and to rebut any evidence
> offered by your client that is inconsistent with the statements made
> during this discussion. This is to ensure your client does not abuse the
> opportunity for this proffer discussion by making false or misleading
> statements, either at the proffer discussion or at trial.

Ex. C at 1-2.

The Sixth Circuit, examining the same language as in the proffer letter

signed by Defendant Bentley, concluded that once a defendant triggered this

waiver provision, the government could "use [the] proffer statements to rebut the

inconsistent evidence that [the defendant] offered." *United States v. Shannon*, 803

F.3d 778, 786 (6th Cir. 2015). Furthermore, a court in this District has held that,

under this provision, statements made in a proffer session are admissible if one of

three events occurs: "(1) on cross-examination of [the Defendant] (if he testifies);

(2) if defense counsel elicits testimony that is inconsistent with [the Defendant's

proffer] statements; and (3) if defense counsel offers evidence that is inconsistent

13

with [the Defendant's proffer] statements."[4]  *United States v. Silber*, No. 09-20223,

2010 WL 1222723, at *1 (E.D. Mich. March 25, 2010) (Roberts, J.); *see also*

*United States v. Fifer*, 206 Fed. App'x 502, 509–10 (6th Cir. 2006) (Cohn, J.)

(unpublished opinion) (holding that defendant's statements, made under

protections of proffer letter, were admissible to rebut evidence introduced by

defendant).

In *United States v. Artis*, 261 Fed. App'x 176 (11th Cir. 2008), the court

upheld the use of a defendant's statement to impeach his testimony under the terms

of a similar proffer agreement.  *Id.* at 178 (the letter provided that "no statements

made by [defendant] or his counsel could be used in the Government's case-in-

chief; however, such statements could be used 'for the purpose of cross-

examination, impeachment, and rebuttal should [defendant] testify at any

proceeding in any manner contrary to this proffer.'"); *see also United States v.*

*Dortch*, 5 F.3d 1056, 1068 (7th Cir. 1993) (finding a "defendant waives any

objection to the use of his own proffer statements to impeach him at trial when he

---

[4] Because the defense would trigger the waiver provision of the proffer agreement
by offering evidence inconsistent with her proffered statements, the defense would
also trigger the waiver provision by making inconsistent statements during the
opening statement.  *See, e.g.*, *United States v. Raisley*, 466 F. App'x 125, 130 (3d
Cir. 2012).

signs a proffer letter that specifically grants the Government permission to impeach him if he testifies inconsistently").

But the use of a defendant's statements is not limited to impeachment or to rebuttal of evidence offered by the defendant through direct examination of her own witnesses. In *Shannon*, the Sixth Circuit held that, under the same provision as in the proffer agreement signed by Defendant Bentley, the defendant's proffer statement was admissible to rebut testimony elicited during cross-examination. 803 F.3d at 784-85. As the court explained, "[a] party does not offer evidence only by calling its own witnesses or putting on its own case," but, instead, "evidence may be offered through cross-examination." *Id.* at 784; *see also United States v. Krilich*, 159 F.3d 1020, 1025 (7th Cir. 1998) ("Evidence is evidence, whether it comes out on direct or cross-examination.").

In *Shannon*, for example, the defendant, was charged with conspiring to commit health care fraud by, among other things, paying Medicare beneficiaries to obtain account information and signatures on pre-signed medical notes. 803 F.3d at 780-81. While cross-examining a government witness, defense counsel "attempt[ed] to negate the fact that [the defendant] had ever paid beneficiaries—in contradiction to his proffer." *Id.* at 786. Because this cross-examination was aimed at creating "an inference that [was] inconsistent with [the defendant's]

15

proffer statements," the defendant triggered the waiver provision of the proffer letter, and "the Government was free to rebut this evidence" using the proffered statements. *Id.* at 785-86; *see also United States v. Hardwick*, 544 F.3d 565, 570–71 (3d Cir. 2008) (holding that, during cross-examination, defense elicited evidence that contradicted defendant's proffered statements, allowing government to introduce statements into evidence); *Krilich*, 159 F.3d at 1025 (same).

Among other things, during the August 11, 2015 proffer, Defendant Bentley told law enforcement that she had heard on multiple occasions from Dr. Alam's staff that he was recklessly issuing pills—that is, prescriptions for controlled substances—and that he was not spending enough time with the patients to justify the billing codes he was using. Furthermore, Defendant Bentley told them that she had heard Dr. Alam would simply stand in the door of the exam room and hand the patient a prescription. Defendant Bentley also acknowledged that, following a Medicare audit in February 2015, she made statements to Dr. Alam's staff such as, "you know things are not being done the way they're supposed to be. It's just a matter of time" and "if I continue down this path, it also makes me a party to the fraudulent [*sic*] and I can't do it anymore." Moreover, when asked about a recorded conversation in which Defendant Bentley advised Dr. Alam with respect to certain Medicaid billing, "nobody's tracking that. It's not Medicare," Defendant

16

Bentley could not provide an explanation for this statement.  Rather, she told law enforcement, "I know it sounds bad."

Should she elicit evidence inconsistent with these statements or any others that she made during the proffer, Defendant Bentley will have waived the restrictions on the United States' use of these and other proffered statements made to agents on August 11, 2015.

   3.   *Defendant Bentley should be precluded from admitting self-serving hearsay from her interviews with law enforcement.*

While the Government intends to introduce portions of Defendant Bentley's July 2015 statement to federal agents and may introduce portions of her August 2015 statement if Defendant triggers the waiver provision by offering inconsistent evidence, Defendant should not be allowed to introduce self-serving hearsay statements made by Defendant during those interviews.  As described in Parts A.1 and A.2 above, Defendant Bentley made a number of inculpatory statements to law enforcement.  However, she also made certain self-serving statements, such as:

- Dr. Alam was justified in billing using the CPT code 99214 if he spent the proper time with the patient, and she "wanted to believe that he (Alam) was doing the right thing."

- Defendant Bentley did not feel that Dr. Alam was purposely upcoding.

17

- Defendant Bentley could not confirm information provided by Dr. Alam's staff that he was not spending enough time with patients because she spent little time in Dr. Alam's office and was only there for short periods one or two times per week.

- Defendant Bentley wanted to drop Dr. Alam as a client for about a year prior to his arrest because he was not documenting things correctly, which generated greater overhead for her company.

The government may elicit non-hearsay testimony regarding Defendant's out-of-court statements pursuant to Federal Rule of Evidence 801(d)(2)(A). This Rule "excludes admissions by a party-opponent (which are offered against the party) from the definition of hearsay because the adversarial process allows the party-declarant to rebut his or her own admissions by testifying at trial." *United States v. c*. "Rule 801(d)(2), however, does not extend to a party's attempt to introduce his or her *own* statements through the testimony of other witnesses." *Id.*

Moreover, because "[p]recluding a defendant from eliciting inadmissible hearsay statements does not violate the Confrontation Clause," preventing a defendant from eliciting her own hearsay statements on cross-examination is consistent with her Confrontation Clause rights. *United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014). Thus, defense counsel may not elicit testimony on cross-

18

examination regarding Defendant Bentley's self-serving statements to law
enforcement agents, which remain inadmissible hearsay. *See id.*; *McDaniel*, 398
F.3d at 545.

Nor are such statements admissible under the rule of completeness, which
was partially codified in Federal Rule of Evidence 106. *See Ford*, 761 F.3d at 652;
*United States v. Adams*, 722 F.3d 788, 826 (6th Cir. 2013). "The 'rule of
completeness' allows a party to correct a misleading impression created by the
introduction of part of a writing or conversation by introducing additional parts of
it necessary to put the admitted portions in proper context." *Ford*, 761 F.3d at 652.
This rule, however, "is not designed to make something admissible that should be
excluded," so "exculpatory hearsay may not come in solely on the basis of
completeness." *Id.* (quotation marks and citation omitted). Defendant may offer
evidence of her own out-of-court statements only if she can demonstrate that they
fall within a valid hearsay exception. *See also United States v. Cortez*, No. CRIM.
14-20209, 2014 WL 6946798, at *3–4 (E.D. Mich. Dec. 8, 2014) (Cox, J.)
(holding that the Government could admit portions of a defendant's post-arrest
statements under Fed. R. Evid. 801(d)(2), and precluding the defendants from
offering other portions "because they would constitute inadmissible hearsay").

19

**B.      The Government Intends to Admit Statements of the Defendants' Co-Conspirators**

The conspiracy involved in this case involved multiple individuals including Dr. Alam and his office staff.  Several government witnesses will testify to or about statements of co-conspirators, and this evidence is admissible, as explained below.  To avoid disruption of the trial and confusion of the jury, this outline of the law in this area is provided in advance to assist the Court should any hearsay objections arise related to co-conspirator statements.

As a general matter, a statement is not hearsay if it is made by a co-conspirator in furtherance of the conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E).  Specifically, Rule 801(d)(2)(E) provides that "a statement . . . is not hearsay" if "[t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy."  Under Sixth Circuit precedent, in order to admit a statement under Rule 801(d)(2)(E), the government "must establish that: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the statement was made in furtherance of the conspiracy."  *United States v. Salgado*, 250 F.3d 438, 449 (6th Cir. 2001) (citing *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir. 1994)).  The government must establish these facts by a preponderance of the evidence, and the Court may

20

consider the contents of the statements at issue in determining whether the

government has met its burden.  *Id.*

1.   *The evidence is admissible as inextricably intertwined with the*
     *conduct charged in the Superseding Indictment.*

The Superseding Indictment charges a conspiracy to commit health care

fraud, wire fraud, and mail fraud.  The government has wide latitude in presenting

evidence to prove the existence of this conspiracy. As a court of this District

explained,

> [C]o-conspirator statements may be admitted under the exception
> where the conspiracy charged is not as broad as the conspiracy
> which forms the basis for admissibility of the statement, *United*
> *States v. Green*, 600 F.2d 154, 157 (8th Cir. 1979) ("It is well
> settled that the scope of the conspiracy charged does not limit the
> application of Fed. R. Evid. 801(d)(2)(E)."); *see also United*
> *States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) ("The
> conspiracy that forms the basis for admitting coconspirators'
> statements need not be the same conspiracy for which the
> defendant is indicted."), and where no conspiracy is charged in
> the indictment at all. *United States v. Ayotte*, 741 F.2d 865, 869
> (6th Cir. 1984); 2 *McCormick on Evidence* § 259 (6th ed. 2009).

*United States v. Stone*, No. 10–20123, 2011 WL 17613, at *3 (E.D. Mich. Jan. 4,

2011).  Indeed, ample evidence will be admitted at trial that this conspiracy

existed, and the government will meet its burden.

21

2.      *The defendant was a member of the conspiracy.*

As outlined in the Background and Expected Evidence section, the government will admit evidence that the defendant was a critical member of this conspiracy. The defendant was not a mere spectator, but was an active participant in the scheme. *See Salgado*, 250 F. 3d at 447 ("Although mere presence at the crime scene is insufficient to show participation, a defendant's participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances.").

3.      *Statements were made in furtherance of the conspiracy.*

A statement is in furtherance of a conspiracy for purposes of Rule 801(d)(2)(E) if "it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." *Salgado*, 250 F.3d at 449. On the other hand, "Mere 'idle chatter' or conversations which further the speaker's own individual objectives rather than the objectives of the conspiracy are not made in furtherance of the conspiracy." *Id.* at 449-50. Under Rule 801(d)(2)(E), courts have admitted statements falling into the following categories, among others:

- Statements that identify other co-conspirators and their roles. *See United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009).

- Statements made to third parties to reassure them of a co-conspirator's

22

reliability. *See United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007).

- Statements made to keep a co-conspirator "apprised of the progress of the conspiracy" or "abreast of a co-conspirator's activities." *Salgado*, 250 F.3d at 450 (internal quotation omitted).

- Statements made to a co-conspirator "to induce continued participation in a conspiracy or to allay his fears." *Id.* at 450 (internal quotation omitted).

The government expects that statements falling into each of these categories and others will be admitted at trial.

### 4. *Two embedded co-conspirator statements are not double hearsay.*

Finally, Rule 801(d)(2)(E) applies to embedded co-conspirator statements, such as when a witness testifies to what a co-conspirator said that another co-conspirator said. This is sometimes referred to as the issue of "double hearsay." Like all Federal Rules of Evidence that either define certain statements as not hearsay or provide for a hearsay exception, Rule 801(d)(2)(E) can be applied more than once. *See* Federal Rule of Evidence 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); *United States v. McLernon*, 746 F.2d

23

1098, 1106 (6th Cir. 1984) (finding that defendant's statements of co-conspirator's statements properly admitted as non-hearsay under Rule 801(d)(2)(E) and that the requirement that the declarant have personal knowledge of that statement is waived).

At trial, the evidence will show that information concerning the conspiracy often flowed through central players, including the Defendant and certain co-conspirators. These central players would relay information from co-conspirators to both co-conspirators and non-conspirators alike to further the conspiracy. As long as both declarants involved were either Defendant or her co-conspirators, such statements are not double hearsay and are admissible.

**C.     The Government Intends to Offer Consensual Recordings Involving Defendant Bentley Made by a Confidential Human Source**

As described above, a CHS, who worked at Dr. Alam's office, made consensual audio/video recordings of, among other things, conversations between Defendant Bentley, Dr. Alam, the CHS, and other members of Dr. Alam's office staff. The government has produced the recordings to the defendants and has exchanged transcripts of certain of these recordings with defense counsel. It is reviewing proposed revisions provided by defense counsel to these transcripts, and

anticipates that the parties will reach agreement on these transcripts.  These

recordings should be admitted, and the transcripts should be submitted to the jury.[5]

> 1.  *The recordings are admissible and may be authenticated by an
>     appropriate witness.*

"Admission of tape recordings rests within the sound discretion of the

district court."  *United States v. Wesley*, 417 F.3d 612, 620 (6th Cir. 2005).  To be

admissible, "tapes must be authentic, accurate and trustworthy, and they must be

audible and sufficiently comprehensible for the jury to consider the contents."

*United States v. Wilkinson*, 53 F.3d 757, 761 (6th Cir. 1995) (internal quotation

marks and citations omitted).  "Tape recordings are generally admissible unless the

incomprehensible portions of the tapes are so substantial as to render the

recordings as a whole untrustworthy."  *United States v. Robinson*, 763 F.2d 778,

781 (6th Cir. 1985) (citing cases).  Even if recordings have some unintelligible

portions, "these segments alone do not require that all the recordings be excluded

from evidence.  Rather, the recordings must be considered as a whole to determine

their trustworthiness."  *Id.* at 782; *see also Wesley*, 417 F.3d at 620.  Accordingly,

the Sixth Circuit has routinely affirmed the admission of recordings made by

---

[5] The government is conferring with defense counsel regarding potential
stipulations to the authenticity or admissibility of exhibits, to include the CHS
recordings.  The information in this section is intended to provide the Court
information regarding the relevant legal standards to the extent the parties are
unable to reach agreement concerning these issues.

25

cooperating witnesses or confidential sources. *See*, *e.g.*, *United States v. Adams*, 722 F.3d at 823; *Wesley*, 417 F.3d at 620-21.

In addition, "[w]hile [the Sixth Circuit has] not . . . indicated precisely what foundation is necessary" to admit recordings, "other circuits have alternately held that the district court must be satisfied that the recording is 'accurate, authentic, and generally trustworthy,' that 'simply required is proof that the tape recording accurately reflects the conversation in question,' or that 'a proper foundation may be established in two ways: a chain of custody or alternatively, other testimony could be used to establish the accuracy and trustworthiness of the evidence.'" *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004) (quoting *United States v. Panaro,* 266 F.3d 939, 951 (9th Cir.2001); *United States v. Doyon*, 194 F.3d 207, 212 (1st Cir.1999); *United States v. Rivera*, 153 F.3d 809, 812 (7th Cir.1998)) (alterations omitted); *see also United States v. Parenteau*, 529 F. App'x 532, 535 (6th Cir. 2013) (explaining that, "one way a party can" authenticate a recording under Fed. R. Evid. 901(a) "is through the testimony of a witness with knowledge that the recording is what it is claimed to be"); *United States v. Simms*, 351 F. App'x 64, 68 (6th Cir. 2009) ("For audio recordings to be admissible, . . . a proper foundation must be established either through chain of custody or testimony establishing the accuracy of the evidence.").

26

In this case, the government intends to call the CHS who participated in the creation of the recordings.[6] *See, e.g.*, *Parenteau*, 529 F. App'x at 535 (finding that the testimony of a cooperating witness who participated in recorded conversations satisfied the authentication requirement); *cf. United States v. Hogan*, 402 F. App'x 54, 60 (6th Cir. 2010) (affirming authentication of recording through voice identification by agent who became familiar with defendant's voice after the recording). In addition, the recorded conversations are audible and generally intelligible, such that the government anticipates the parties will reach agreement concerning the transcripts. If, however, Defendant Bentley contends that the recordings contain sufficient unintelligible portions to render them untrustworthy, the government will submit them to the court to "determine whether the tapes are 'audible and sufficiently comprehensible for the jury to consider the contents.'" *United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994).

    2.    *The jury should be permitted to use transcripts pursuant to a cautionary instruction.*

"The use of a transcript of taped recordings is permissible as an aid to the jury, within the discretion of the trial court, when certain procedures are followed

---

[6] If necessary, the government may call agents who assisted the cooperating witness in making the recordings. *See, e.g.*, *United States v. Lanzar*, 69 F. App'x 224, 229 (6th Cir. 2003) (affirming admission of audio recordings where the "agent who installed the recording devices authenticated the audio tapes, as did . . . one of the parties to the conversation").

for determining its accuracy." *United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994). The Sixth Circuit has identified several procedures that may be used to ensure the accuracy of transcripts:

> The preferred practice is to have both parties stipulate to the accuracy of the transcripts. When the parties dispute the accuracy of the transcripts, the transcriber should attest to the accuracy of the transcripts, and the court should make a determination of accuracy out of the jury's presence, by reading the transcripts while listening to the tapes. The least preferred method is to have each party prepare transcripts for the jury.

*United States v. West*, 948 F.2d 1042, 1044 (6th Cir. 1991) (citations omitted).

As described above, the government has exchanged transcripts for pertinent portions of the recordings with defense counsel, and is reviewing Defendant's proposed revisions into the transcripts. It anticipates that it will incorporate these revisions and that the parties will stipulate to the accuracy of the transcripts. If the parties are unable to stipulate, the government will provide an attestation and will make the transcripts and recordings available for a determination of accuracy by the Court.

Under these circumstances, the jury should be permitted to use the transcripts during deliberations, although they are not in evidence. *See* Sixth Circuit Pattern Jury Instruction 7.17 & Commentary Note. "Use of transcripts not in evidence is permissible where the tape is in evidence, the defendant has not

28

questioned the accuracy of the transcript, and the defendant has shown no

prejudice." *Scarborough*, 43 F.3d at 1025; *see also United States v. Jacob*, 377

F.3d 573, 582 (6th Cir. 2004) (finding no error in district court's decision to permit

jury's use of transcript as an aid during trial and deliberations where the record

"provide[d] a sufficient basis for a court to conclude that the transcripts bore a

semblance of reliability").

In *Scarborough*, for example, the defendant questioned the accuracy of the

tapes, but did not show that the transcripts were inaccurate. *Id.* After reviewing

the government's version of the transcript, the district court permitted the jury to

use the transcript during deliberations, subject to a cautionary instruction that only

the tape was evidence. *Id.* at 1024. The Sixth Circuit affirmed, holding that "[a]s

long as the trial court instructs the jury that the tapes and not the transcripts are

evidence it is not error to allow a jury to have transcripts in deliberations, even if

the transcripts were not admitted into evidence." *Id.* 1024–25; *see also United*

*States v. Elder*, 90 F.3d 1110, 1129–30 (6th Cir. 1996) (affirming district court

allowing jury to use transcripts during playing of recordings and deliberations in

light of court's limiting instructions).

In this case, the government is requesting the Sixth Circuit Pattern Jury

Instruction regarding transcriptions of tape recordings. *See* Sixth Circuit Pattern

29

Jury Instruction 7.17.  The government requests that this instruction be provided both before the recordings are first shown to the jury and with the jury instructions provided prior to deliberations.  Subject to this cautionary instruction, the jury should be permitted to use the transcripts as an aid in reviewing the recordings and during deliberations.

      3.     *Admission of the recordings is consistent with hearsay rules and the Confrontation Clause.*

When offered by the government, the recordings do not contain inadmissible hearsay.[7]  As described in Part A above, Defendant's out-of-court statements are admissible non-hearsay under Rule 801(d)(2)(A).  Consistent with this Rule, a "defendant's statements in a tape recorded conversation constitute non-hearsay admissions of a party."  *United States v. Alsop*, 12 F. App'x 253, 259 (6th Cir. 2001).  Likewise, as described in Part B above, recorded statements by Defendant's co-conspirators in furtherance of the conspiracy are admissible as non-hearsay pursuant to Rule 801(d)(2)(E).  *See, e.g.*, *United States v. Pike*, 342 F. App'x 190, 194 (6th Cir. 2009); *Mooneyham*, 473 F.3d at 286.

---

[7] As described in Part A.3 above, the rule of completeness does not permit the admission of otherwise inadmissible evidence; therefore, to introduce portions of the recordings beyond those offered by the government, Defendant Bentley must show that the recordings do not contain inadmissible hearsay.  *See Adams*, 722 F.3d at 826.

Furthermore, the statements of the CHS and others on the recordings may be admitted, at a minimum, to place Defendant's admissions in context. *See United States v. Henderson*, 626 F.3d 326, 337 (6th Cir. 2010) (concluding that defendant's statements during recorded telephone conversations "were non-hearsay admissions under [Rule 801(d)(2)(A)], and the statements made by others were not admitted to show the truth of the matters asserted, but to provide context for [the defendant's] admissions"); *Alsop*, 12 F. App'x at 259 ("[A]n informant's side of the conversation is admissible as non-hearsay evidence, when offered to make a defendant's statements intelligible as an admission and to place them in context.").

The admission of the recordings also does not run afoul of Defendant Bentley's rights under the Confrontation Clause. "[T]he Confrontation Clause bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination.'" *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). Even if a statement is testimonial, however, the Confrontation Clause does not bar its use for purposes other than establishing the truth of the matter asserted. *United States v. Deitz*, 577 F.3d 672, 683 (6th 2009).

31

Statements by co-conspirators and individuals other than the CHS are not testimonial, as these individuals "did not know that [their] statements were being recorded" and "did not anticipate them being used in a criminal proceeding," so "the Confrontation Clause does not apply." *Johnson*, 581 F.3d at 325; *see also Mooneyham*, 473 F.3d at 286-87 (concluding that co-conspirator statements made in furtherance of the conspiracy "are inherently non-testimonial"); *United States v. Watson*, 525 F.3d 583, 589 (7th Cir. 2008) ("A statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

Recorded statements by the CHS may be testimonial. *See Deitz*, 577 F.3d at 683 (noting Sixth Circuit precedent that statements by a confidential informant are testimonial). But because these statements are not being offered for the truth of the matter asserted, and because it is anticipated that the CHS will testify at trial, these statements do not violate Defendant's Confrontation Clause rights. *See United States v. Sutton,* 387 F. App'x 595, 602 (6th Cir. 2010) ("[N]o Confrontation Clause violation occurs when statements by a government informant are admitted to provide context, not to establish the truth of the matter asserted.").

**D.    Defendant Should Be Precluded from Blaming Medicare or Medicaid**

As a defense to the Superseding Indictment, Defendant Bentley may argue in her jury addresses, or may try to present evidence during her case-in-chief or otherwise, that because Medicare and Medicaid paid the claims she submitted on behalf of Dr. Alam, she could not and did not defraud these programs.  In particular, Defendant may seek to argue that Medicare and/or Medicaid were negligent by failing to recognize patterns of fraudulent billing in Dr. Alam's claims data.  However, the "'blame the victim' defense . . . has not fared well in the Sixth Circuit" and "has been roundly rejected by th[e] Court's sister circuits." *United States v. James*, 496 F. App'x 541, 545 (6th Cir. 2012).

It is well-settled that "[a] perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence." *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc).  "If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright.  These are criminal statutes, not tort concepts." *United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) (quoting *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980)); *see also United States v. Benchick*, No. 13-CR-20453, 2014 WL 4181970, at *2 (E.D. Mich. Aug. 21, 2014) ("It is no defense to wire fraud . . . that the victim of the

33

fraud was negligent, gullible, or incompetent." (quotation marks and citation omitted)).

Courts, realizing that inquiries into a victim's negligence are irrelevant and potentially prejudicial, have taken measures to preclude such evidence and arguments. *See United States v. Thomas*, 377 F.3d 232, 243-44 (2d Cir. 2004) (affirming restrictions on cross-examination of victim; rejecting defendant's argument that victim's foolishness vitiated defendant's fraudulent intent); *United States v. Davis*, 226 F.3d 346, 358-59 (5th Cir. 2000) (affirming jury instruction that "naivety, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct, if any, on the part of a defendant"); *see also United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (noting that "[t]he victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for her substantive offenses").

Fundamentally, the actions of the victims—here, the Medicare and Medicaid programs—are not relevant to disproving a fraud. While evidence of fraudulent billing patterns—such as Defendant's submission of claims for more than 24 hours of services purportedly provided by Dr. Alam in a single day—is relevant to establish the fraud, evidence and arguments that Medicare and Medicaid could have detected these patterns should be precluded. Such arguments are not legally

34

viable and fall squarely within the type of blame-the-victim defense that the Sixth Circuit and other courts have rejected.

Moreover, arguments about Medicare and Medicaid's conduct would distract from the ultimate issue for the jury of whether a fraud was committed and whether Defendant Bentley had the requisite intent to defraud.  Even if the Court were to find the evidence had some relevance, where there is a real threat of jury confusion, the Court should exercise its wide discretion under Federal Rule of Evidence 403 to exclude the evidence.  Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

**E.    The Court Should Preclude the Use of Law Enforcement Agent Interview Reports or Rough Notes for Impeachment of Government Witnesses**

*1.    Interview reports are not statements of the witness under the Jencks Act.*

Defense counsel may not use interview reports prepared by government agents to cross-examine witnesses that were the subjects of these memoranda, as such reports are not "statements" made by those witnesses.  A statement within the meaning of the Jencks Act is defined as (1) "a written statement made by said witness and signed or otherwise adopted and approved by him," (2) a recording or transcription that "is a substantially verbatim recital of an oral statement made by

35

said witness and recorded contemporaneously," or (3) a statement made by a

witness to the grand jury.  18 U.S.C. § 3500(e)(1)–(e)(3).  In *Palermo v. United*

*States*, the Supreme Court held that because the Jencks Act is meant to restrict the

defendant's use of discoverable statements to impeachment, "only those statements

which could properly be called the witness' own words should be made available

to the defense."  360 U.S. 343, 352 (1959).  The Court elaborated that "summaries

of an oral statement which evidence substantial selection of material" or

"statements which contain [an] agent's interpretations or impressions" are "not to

be produced."  *Id.* at 352-53.

Consistent with *Palermo*, interview reports are not discoverable under the

Jencks Act because they are not statements of the witness within the meaning of

subsection (e)(1) of the statute.  Although an exception may be made where a

witness has reviewed and adopted the information in the interview report—which

was not done in this case—this adoption requirement "clearly is not met when the

[writer] does not read back, or the witness does not read, what the [writer] has

written."  *Goldberg v. United States*, 425 U.S. 94, 110 n.19 (1976).

Moreover, because the interview reports were written after the interviews in

question were completed, and thus reflect the thought processes and interpretations

of the agent, they do not constitute a contemporary and substantially verbatim

36

recital of the witness's statement under subsection (e)(2) of the Jenks Act.

In sum, although the government has made a practice of turning over relevant interview reports in this case and continues to do so, there are no interview reports in this case that have been "adopted" by the witness such that they can be considered statements of the witness. They are statements of government agents summarizing the substance of a witness interview. It is clearly unfair and improper to cross-examine a witness on the summary created by another individual, and defense counsel should be precluded from doing so.

> 2.    *Proper use of the reports at trial.*

Counsel should be limited to using the interview reports consistent with the law and rules of evidence. In particular, the defense should be precluded from introducing the contents of the interview reports to impeach witnesses on the basis of inconsistent statements because the interview reports are not the statements of the witnesses themselves. Moreover, defense counsel must be precluded from publishing the contents of the interview reports to the jury, or otherwise suggesting to the jury that the interview report is a statement of the witness. To allow otherwise would subvert the meaning of the Jencks Act and the Supreme Court's decision in *Palermo*, which held that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be

the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Palermo*, 360 U.S. at 350.

The defense is, of course, free to ask a witness whether he or she made a statement that is reflected in an agent interview report. If the defense is not satisfied with the witness's answer, however, the defense may not publish or introduce the contents of the interview report as a prior inconsistent statement.

The Sixth Circuit addressed this question directly in *United States v. Brika*, in which it held that "[s]uch documents [i.e., interview reports] have been deemed inadmissible for impeaching witnesses on cross-examination because they represent the 'investigator's selections, interpretations and interpolations.'" 416 F.3d 514, 529 (6th Cir. 2005), *abrogated on other grounds by United States v. Booker*, 543 U.S. 222 (2005); *see also United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement"); *United States v. Hill*, 526 F.2d 1019, 1026 (10th Cir. 1975) (upholding the trial court's decision to "not allow counsel to use the 302 statement to impeach a witness because the witness did not prepare or sign the document and probably never adopted it").

38

Moreover, the defense may not use the interview report in a way that

suggests to the jury that the interview report is a statement of the witness.  *See*

*United States v. Marks*, 816 F.2d 1207, 1210-11 (7th Cir. 1987) (holding that

where defense counsel read from an interview report during cross-examination in a

way that would "seem authoritative" and potentially confuse the jury, the judge

was entitled to require the witness be shown the interview report and given the

opportunity to adopt or reject it as a statement, although such a practice was no

longer required by the federal rules of evidence).

## F.     The Government May Offer Evidence of Defendant's Conduct That Is Similar and Related to the Conduct in the Superseding Indictment

The United States may offer evidence that is admissible as inextricably

intertwined with the conduct charged in this case, or in the alternative, admissible

under Federal Rule of Evidence 404(b).  Specifically, the government has provided

notice, consistent with Rule 404(b), that it may introduce evidence that

(1) Defendant submitted claims for Dr. Alam that he did not or could not have

provided prior to the charged conspiracy period, (2) Defendant billed insurers other

than Medicare and Medicaid for services that were not rendered, and (3) Defendant

participated in upcoding for physicians other than Dr. Alam.  (Dkt. No. 35.)  For

the reasons set forth below, the Court should allow the introduction of this

evidence.

1.     *The evidence is inextricably intertwined with the charged offense.*

The Sixth Circuit has repeatedly "recognized the propriety of introducing 'background' evidence," which "has a causal, temporal or spatial connection with the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000); *see*, *e.g.*, *United States v. Frederick*, 406 F.3d 754, 758 (6th Cir. 2005); *United States v. Edmond*, 815 F.3d 1032, 1045 (6th Cir. 2016).

Admissible background evidence "consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *Hardy*, 228 F.3d at 748. Courts therefore "may admit evidence via this route if it (1) is a prelude to the charged offense; (2) is directly probative of the charged offense; (3) arises from the same events as the charged offense; (4) forms an integral part of a witness's testimony; or (5) completes the story of the charged offense." *Edmond*, 815 F.3d at 1045 (internal quotation marks omitted); *United States v. Meda*, No. 11-20052, 2013 WL 398924, at *1 (E.D. Mich. Feb. 1, 2013) (finding admissible evidence that health care fraud defendant engaged in the same fraudulent conduct at other agencies because "[e]xclusion of the evidence would omit a large portion of the story").

The Sixth Circuit, moreover, has rejected the argument that other acts are "not *inextricably* intertwined with the charged crimes" where the defendant contends they are "not *necessary* to the government's story." *Edmond*, 815 F.3d at 1046 (explaining that this argument "gives these terms a construction our caselaw cannot bear"). Instead, such acts may be admitted where the "evidence "provides background information, establishes a nexus between individuals, or completes the story of the charged offense." *Id.*

The evidence that the government seeks to introduce here meets this standard. First, the evidence at trial will show that Defendant Bentley began serving as the biller for Dr. Alam in 2002, although the conspiracy period alleged in the Superseding Indictment does not start until 2014. Evidence that Defendant Bentley submitted false and fraudulent claims for Dr. Alam—for example, billing for more than 24 hours of services in a single day—even before the conspiracy period serves as a prelude to the charged offense. It demonstrates that Dr. Alam did not suddenly, more than fourteen years into their business relationship, purport to provide services that could not possibly have occurred. This conduct was not an aberrant outlier, but part of the background of their relationship and to the conspiracy.

41

Second, during the same period Defendant was submitting false and fraudulent claims to Medicare and Medicaid for visits that did not occur (and could not have occurred) as billed, she was also submitting similarly false and fraudulent claims to private insurers.  In particular, there is evidence that Defendant submitted false and fraudulent claims to private insurers for visits purportedly performed on Dr. Alam's office staff and Defendant Bentley herself, when services were not actually rendered.  During a recorded conversation regarding Dr. Alam's excessive billing, Defendant Bentley stated that "[a] lot of times" Dr. Alam billed as though he had performed an office visit on her, when in fact he did not "do anything but sit at the end of his desk and talk to [her] about work."  (Feb. 26, 2015 Tr.)

In addition, Defendant Bentley billed the CHS's commercial insurer for an urgent care visit that Defendant Bentley was aware had not taken place. In another recorded conversation, the CHS informed Defendant Bentley that Dr. Alam prepared a billing sheet for an urgent care visit purportedly performed on the CHS, but no such visit actually occurred.  (Nov. 4, 2014 Tr.)  Subsequently, Defendant Bentley claimed she "never billed for" this visit and instead "threw it away," but the CHS informed Defendant Bentley that she had received a bill for the visit. (Dec. 2, 2014 Tr.)  During her July 7, 2015 interview, Defendant Bentley recalled the CHS telling her that the visit had not occurred, and said that she must have

42

accidentally billed the visit. (*See* Ex. A at 3.) But in her August 11, 2015 interview, made pursuant to the proffer agreement, Defendant Bentley stated that she had verified that Dr. Alam had a patient record reflecting that he saw the CSH for hypertension on the relevant date, and therefore said that she believed she had billed the CHS's insurance properly, despite Defendant Bentley's prior statements. (*See* Ex. B at 2.) Defendant Bentley then sent the CHS bills for co-pay associated with the visit, on which she included a handwritten note stating that she had verified with the physician (i.e., Dr. Alam) and the assistant that the CHS had requested to be seen on that date. In reality, the visit did not occur and the CHS did not request to be seen.

Defendant's submission of false and fraudulent claims to commercial insurers therefore arose from the same events as the charged offense: Dr. Alam's excessive billing for visits that did not take place or did not take place as billed during the conspiracy period. Evidence that Defendant submitted false and fraudulent claims to commercial insurers in addition to Medicare and Medicaid, moreover, forms an integral part of the witness testimony and completes the story of the evidence. As a result, this evidence is admissible.

Finally, evidence that Defendant participated in upcoding for other physicians is also inextricably intertwined with the conspiracy involving Dr. Alam.

43

In one recorded conversation, for example, while encouraging Dr. Alam to use the CPT code 99214 for Medicaid patients, Defendant Bentley stated:

> . . . [W]hy can't you do a 99214 on all your Great Lakes patients and on your Medicaid's. It brings $43 dollars which is still not the same amount as your Medicare pays. It is still half of what they are paying, but put it two one four—*that is what the other physicians are doing*. Not that that's okay, but I mean, if you are spending that time with them, put it down.

(Aug. 8, 2014 Tr. (emphasis added).) These statements are directly probative of the charged offense, as she uses other providers' conduct to encourage Dr. Alam to participate in the charged offense. Thus, this evidence should be admitted as inextricably intertwined.

### 2. The evidence is admissible under Rule 404(b).

Even if it were not inextricably intertwined, this evidence would be admissible under Federal Rule of Evidence 404(b) as demonstrative of motive, intent, preparation, plan, knowledge, and absence of mistake. The Sixth Circuit has described Rule 404(b) as a rule of "inclusion, rather than exclusion, since only one use is forbidden and several permissible uses of such evidence are identified." *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985). The admission of Rule 404(b) evidence is determined by a three-step analysis: (1) whether the other acts actually occurred, (2) whether they "were admissible for a permissible [Rule] 404(b) purpose," and (3) whether the acts' probative value is substantially

44

outweighed by the danger of unfair prejudice. *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012).

Here, evidence that Defendant submitted false and fraudulent claims on behalf of Dr. Alam prior to the conspiracy period, including more than 24 hours of claims in a single day, demonstrates her intent to conspire to commit healthcare fraud and her knowledge and lack of mistake that she was doing so. Defendant's statements to law enforcement, for example, suggest that she may argue that she spoke with Dr. Alam to discourage excessive billing, and therefore that she lacked intent to defraud. However, evidence that he had participated in this conduct over an extended period, and that she remained as his biller after he had engaged in excessive billing in the past, contradicts this argument and is relevant to establishing her intent.

Similarly, evidence that Defendant Bentley submitted claims to commercial insurers for visits she knew did not take place evidences her fraudulent intent. And her conduct in continuing to send bills to the CHS for such a visit, even after Dr. Alam's arrest and after she acknowledged to law enforcement that the CHS had informed her the visit did not occur makes clear that her submission of false and fraudulent claims was not due to a mistake or accident.

45

In addition, evidence that she participated in upcoding with other physicians counters any argument that Defendant Bentley relied on Dr. Alam to select the appropriate billing code and trusted him to bill appropriately.  As described above, this evidence shows that she conspired with Dr. Alam to upcode by encouraging him to use inappropriate codes in order to increase reimbursement.  Thus, because this evidence demonstrates, *inter alia*, her intent, knowledge, and absence of mistake, it would be properly admissible under Rule 404(b).

## G.   Defendant Should Be Precluded From Offering Evidence of Any Legitimate Medical Billing or Other Good Conduct as a Defense to the Charges in the Superseding Indictment

Evidence that Defendant properly billed some services to Medicare and Medicaid should be precluded because such evidence is not probative of the issues at trial and will serve only to confuse or mislead the jury.  Further, to the extent such evidence might have any probative value, it should nonetheless be excluded under Federal Rule of Evidence 403, because the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, and waste of time.

It is well-settled that, in fraud cases, evidence that the defendants did not commit fraud in all instances is irrelevant.  Courts have repeatedly held that evidence that a defendant engaged in legal, honest conduct simply has no bearing

46

on whether the defendant engaged in, or had knowledge of, fraudulent conduct charged by the government.  *See United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) ("For the same reason that prior 'bad acts' may not be used to show predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes."); *see also United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (affirming district court's ruling precluding the defendant from offering evidence of his legitimate business activities in order to negate evidence of his fraudulent intent as to the charged conduct); *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."); *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) (finding defendant's performance of some legal trades irrelevant to his knowledge of illegal trades).

Here, the government has alleged that Defendant conspired to execute the fraudulent scheme outlined in the Superseding Indictment and described above. That she may also have properly billed medical services is irrelevant to the question of the defendants' guilt with respect to the charges in the Superseding Indictment.  As such, evidence of legitimate billings to Medicare or Medicaid should not be admissible.

47

**H.   Defendant Should Not Be Permitted to Make Any Argument that Encourages Jurors to Ignore the Law or This Court's Instructions, or Otherwise Violates Their Oaths as Jurors**

Jurors must follow the law.  Thus, a defendant is not entitled to a jury instruction on nullification.  *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988).  Nor may a defendant ask the jury to refuse to apply the law as instructed.  *See United States v. Calhoun*, 49 F.3d 231, 236 n.6 (6th Cir. 1995) (upholding refusal of defendant's request to "inform the jury . . . of the jury's power to nullify a law or sentence"); *see also United States v. Thompson*, No. 99-41007, 2001 WL 498430, *16 (5th Cir. Apr. 9, 2001) (unpublished) ("Like other circuits, we hold that the right to make closing argument does not include the right to have counsel make an improper argument encouraging the jury to use its 'de facto power to refuse to apply the law as instructed by the court [and] exercise . . . such power in dereliction of the jury's sworn duty.'") (alteration in original) (quoting *United States v. Funches*, 135 F.3d 1405, 1408 (11th Cir. 1998)); *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) ("A trial judge . . . may block defense attorneys' attempts to serenade a jury with the siren song of

48

nullification . . . .")).  And a defendant is "not entitled to offer evidence and testimony for the sole purpose of inviting jury nullification."  *United States v. Duval*, 865 F. Supp. 2d 803, 808 (E.D. Mich. 2012).

Just as a defendant may not explicitly appeal for nullification, a defendant also cannot attempt to elicit sympathy in order to invite nullification, and courts have excluded evidence and precluded argument designed for this purpose.  *See, e.g.*, *United States v. Copeland*, 291 F. App'x 94, 97 (9th Cir. 2008) (excluding evidence of defendant's childhood abuse because its minimal probative value "did not substantially outweigh the possible prejudice to the government of jury nullification based on sympathy"); *United States v. Levin*, No. 15 CR. 101 (KBF), 2016 WL 299031, at *12 (S.D.N.Y. Jan. 25, 2016) (deeming "plainly improper" the use of evidence "to elicit sympathy and use jury nullification as a defense").

The government presently has no basis to believe that defense counsel intends to argue for jury nullification.  The government, however, writes to inform the Court about evidence that may be used to elicit sympathy so that the Court may properly limit the use of this evidence.  In particular, the government anticipates that it will introduce limited evidence regarding Defendant Bentley's daughter who worked at Dr. Alam's office, obtained prescriptions for controlled substances under Dr. Alam's name while she was an employee at his office, and subsequently

49

died of an overdose. Defendant Bentley refers to her daughter and her daughter's death during some of the recorded conversations that the government anticipates introducing at trial. In these conversations, Defendant Bentley indicates, among other things, that she is aware of certain activities at Dr. Alam's office based on her daughter's former employment. (*See, e.g.* May 19, 2015 Tr. (stating that Dr. Alam "had [Bentley's daughter] sign [Dr. Alam's signature] a lot").) While this evidence is relevant to Defendant Bentley's knowledge and intent to defraud, it may not be used to appeal to the jury's sympathy in order to invite nullification.

## I.   Other Evidentiary Issues

The government sets forth here its position that the defendants should be precluded from eliciting testimony or otherwise producing evidence on the following topics.

> 1.   *The presence or absence of any particular person on the government's witness list or the government's plans or decision to call or not call a particular witness.*

For various reasons, the government may elect not to call every witness on its list. A witness might become unavailable or lack credibility. Or, in light of other evidence presented at trial, the witness's testimony may become cumulative. If the jury is informed that the government listed an individual on its witness list, and that person does not testify, the jury could become confused. Thus, Defendant

may not discuss the contents of the government's witness list in front of the jury.

Further, if Defendant intends to discuss or ask the jury to draw any negative

inference from the government's decision not to call a witness, she first must show

that the witness was "peculiarly within [the United States'] power to produce" and

that the testimony would elucidate the conduct at issue. *United States v.*

*Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973) (citation omitted).

> 2.     *Criminal records of any witnesses.*

Federal Rules of Evidence 608 and 609 allow a party to use only certain

criminal convictions to impeach a witness.  Further, if a party intends to introduce

evidence of a conviction that is more than ten years old, he or she must not only

demonstrate that its probative value outweighs the potential for prejudice, but must

also provide reasonable written notice to the opposing party.

> 3.     *Disputes over discovery, including the timing of the production of*
>        *records to the government by witnesses.*

Discovery disputes are legal issues properly handled outside the presence of

the jury.

> 4.     *Whether the government has charged other persons.*

Except in the instance of a witness who testifies at trial, whether the

government has charged another person in this case or others is irrelevant to the

51

guilt or innocence of Defendant.  *See* Sixth Circuit Pattern Jury Instructions 2.01,

8.08 & Commentary Note; *United States v. Larch*, 399 F. App'x 50, 55-56 (6th

Cir. 2010) (explaining that guilt of another does not excuse a defendant from

liability for his actions).

> 5.   *Plea negotiations, plea offers, or the defendants' rejection of a plea offer.*

The substance of plea negotiations, plea offers, or the defendants' rejection

of a plea offer is irrelevant.

> 6.   *Potential punishment or any other consequences that might result from a conviction.*

Reference to possible punishment is impermissible, for it appeals to the

jury's sympathy and is irrelevant.  *See* Sixth Circuit Pattern Jury Instructions 8.05

& Commentary Note; *United States v. Calhoun*, 49 F.3d 231, 236 n.6 (6th Cir.

1995) (affirming refusal to permit defendant to inform the jury of her potential

punishment).

> 7.   *Defense counsel's personal opinions of or relationship with the defendant.*

Defense counsel's personal opinions of or relationship with a defendant is

irrelevant and, unless defense counsel intends to testify as a witness, is

impermissible.  *See United States v.* Young, 470 U.S. 1, 8-9 (1985) ("Defense

52

counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case.").

## <u>Conclusion</u>

The United States respectfully submits the foregoing in the hope that it will identify possible issues that may arise during trial and assist the Court in resolving them.

Respectfully submitted,

BARBARA L. MCQUADE
*United States Attorney*

<u>s/ Jessica C. Collins</u>
Jessica C. Collins

Thomas J. Tynan
Jessica C. Collins
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 645-2651
jessica.collins@usdoj.gov

Dated: December 1, 2016

53

## CERTIFICATE OF SERVICE

I certify that, on December 1, 2016, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to counsel for Defendant.

s/ Jessica C. Collins
JESSICA C. COLLINS
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 645-2651
jessica.collins@usdoj.gov